## UNITED STATES
## COURT OF FEDERAL CLAIMS

---

| | |
|---|---|
| HAWKER BEECHCRAFT DEFENSE COMPANY, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Docket No. 11-897C ) |
| UNITED STATES, | ) ) |
| Defendant. | ) |

<u>Live Tape</u>

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on December 28, 2011.)

Pages: 1 through 33

Place: Washington, D.C.

Date: December 28, 2011

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HAWKER BEECHCRAFT DEFENSE COMPANY, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Docket No. 11-897C |
| UNITED STATES, | ) ) ) |
| Defendant. | ) |

Wednesday,
December 28, 2011

<u>Live Tape</u>

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on December 28, 2011.)

BEFORE: HONORABLE GEORGE W. MILLER
                 Judge

APPEARANCES: (Via Telephone)

<u>On Behalf of Plaintiff</u>:

JAMES J. MCCULLOUGH, Esquire
MICHAEL J. ANSTETT, Esquire
Fried, Frank, Harris, Shriver & Jacobson, LLP
801 17th Street, N.W.
Washington, D.C. 20006
(202) 639-7000

APPEARANCES:   (Cont'd)

<u>On Behalf of Defendant</u>:

JOHN HUNTER BENNETT, Esquire
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
(202) 616-2279

1          P R O C E E D I N G S

2                                        (10:58 a.m.)

3          THE COURT:  Counsel, this is Judge Miller

4    speaking.  I would like to do a roll call of our own

5    and before I do, I want to state that we are here for

6    an initial status conference in the case of <u>Hawker</u>

7    <u>Beechcraft Defense Company LLC, Plaintiff, v. The</u>

8    <u>United States, Defendant</u>, Docket No. 11-897C.  And at

9    this point, counsel, please identify yourself and

10   identify the party whom you are representing, starting

11   with Mr. McCullough.

12         MR. MCCULLOUGH:  Good morning, Your Honor.

13   Representing the Plaintiff, Hawker Beechcraft Defense

14   Company, on behalf of Fried, Frank, I am James

15   McCullough and I have with me Michael Anstett.

16         THE COURT:  Thank you, very much, Mr.

17   McCullough.  Mr. Bennett?

18         MR. BENNETT:  Good morning, Your Honor.  On

19   behalf of the United States, I am Hunter Bennett.

20         THE COURT:  Do we have agency counsel, Mr.

21   Bennett?

22         MR. BENNETT:  We do not, Your Honor.

23         THE COURT:  Can you tell me why that's the

24   case?

25         MR. BENNETT:  The agency counsel that's most

familiar with the case is at the Wright Patterson Air

Force Base, Your Honor, and, unfortunately, I have not

been able to get in touch with her thus far.  It's a -

- I believe it's as a result of the holidays.

THE COURT:  Do you have any indication of

when this individual might be available to

participate?

MR. BENNETT:  I do not, Your Honor.  I have,

however, been able to speak with the contracting

officer at Wright Patterson, so I have obtained a fair

amount of information through her, and I have also

spoken to agency counsel, who is in the Washington,

D.C. area, and I have obtained some additional

information from him, Your Honor.

THE COURT:  In that regard, I think one of

the first items on our agenda needs to be the motion

for a temporary restraining order or preliminary

injunction, filed by the Plaintiff, and, Mr. Bennett,

have your consultations yielded any information on

what the government's position might be with respect

to that motion?

MR. BENNETT:  It has, Your Honor.  And at

the outset, I should probably say that on December

22nd, after the GAO decision was rendered, the Air

Force, at that point, awarded the contract to the

1    Sierra Nevada Corporation.  And it's my understanding

2    that the Sierra Nevada Corporation has begun

3    performance, though how much they have actually

4    accomplished over the course of the last six days, I'm

5    not sure, Your Honor.  Our position is, the Air Force

6    believes strongly that performance of this contract

7    needs to proceed at this point.  The first planes are

8    scheduled to be delivered in April of 2013 and the Air

9    Force believes that it's very important to meet this

10   schedule.  We don't believe that Hawker would sustain

11   any irreparable harm, if this Court were to decline to

12   grant preliminary injunctive relief at this stage of

13   the litigation.

14        Hawker identifies three potential harms in

15   its papers.  The first is the lost of a fair

16   opportunity to compete for a contract.  The second is

17   the possibility of being excluded from future LAS

18   orders.  And the third is the denial of the right to

19   have a bid fairly and lawfully considered.  And none

20   of these harms would be exacerbated by declining to

21   grant injunctive relief at this point.  If this Court

22   were to decide that Hawker was wrongly excluded and if

23   Hawker were ultimately to win the award of this

24   contract, all it means is that the Air Force would

25   acquire its planes from Hawker rather than Sierra

1    Nevada and, in doing this, this would eliminate all

2    three of Hawker's alleged harms.  And although the Air

3    Force might have to reimburse Sierra Nevada for the

4    work that it performed during the course of this

5    protest, that's an Air Force problem, rather than a

6    Hawker problem.

7         In an effort to minimize any potential

8    expense like this, we'd be willing to litigate this

9    case on a very aggressive schedule.  You know, from

10   the time that we file the administrative record, we

11   can do one-week turnaround time on the briefs.  We can

12   do two-week turnaround time on the briefs.  We can do

13   whatever the protestor would like to do.

14        THE COURT:  Mr. McCullough, what's your

15   reaction to that presentation?

16        MR. MCCULLOUGH:  Your Honor, we vehemently

17   disagree with that presentation.  There's irreparable

18   harm in the -- now, we've just learned from the first

19   time, Your Honor, for the first time, although we did

20   talk to Mr. Bennett on the 22nd and the 23rd, we

21   didn't know until this second that the contract had

22   been awarded.  Now, I'm a little surprised at not

23   having been given this advanced notice.

24        MR. BENNETT:  Your Honor, I learned this

25   information yesterday afternoon and, apparently, it

1    was made public at 5:00 p.m. on the website.

2            THE COURT:  Is that 5:00 p.m. yesterday?

3            MR. BENNETT:  Five p.m. yesterday, Your

4    Honor.

5            MR. MCCULLOUGH:  So, Your Honor, I'm a

6    little taken aback learning this now at the initial

7    status conference.  All of our papers, as you see,

8    were based upon the concept that we were dealing with

9    a pre-award protest.

10           THE COURT:  Right.

11           MR. MCCULLOUGH:  So, now, what we see is

12   that the Air Force has behind the scenes gone ahead

13   without any -- knowing that there was a protest

14   coming, Your Honor, knowing that they had received a

15   pre-filing notice of this case being filed as soon as

16   the court reopened, as soon as the court reopened,

17   because, as Your Honor knows, the general order shut

18   the court down on Friday and on Monday for the

19   holidays.  Now, the Air Force steals a march and

20   identifies this as a post-award protest.  So, we're

21   taken aback by that maneuver.  But, we'll respond to

22   it, Your Honor.

23           We have put into the pleadings, obviously,

24   the well-recognized genre of irreparable harm that

25   occurs when an awardee is allowed to continue with

1    performance.  It is a harm to us through obviously the

2    loss of revenue to the company, the ultimate loss of

3    jobs, and the ability to gain experience in the

4    performance of the contract.  And this last point,

5    Your Honor, I want to stress.  It's not in the papers,

6    but the fact is that by allowing Embraer to go forward

7    with the performance of the initial stages of this

8    procurement, they are allowing Embraer to gain

9    experience in the performance of the contract and,

10   thereby, to gain a leg up, an advantage, an unfair

11   competitive advantage that in any reopening of the

12   procurement, will irreparably harm Hawker's ability

13   because the Air Force will point to Embraer's already

14   ongoing performance in the early stages of this

15   contract as being another reason why Embraer should be

16   allowed to stay with -- or keep the contract, even

17   though we may make serious points about our improper

18   exclusion from the competitive range.

19           What the Air Force has done is put a bag

20   over their head and refused to look at a fair

21   competitive comparison between Embraer and us.  In

22   addition, Your Honor, they have refused -- and when I

23   say, "us," I mean Hawker Beechcraft -- they have

24   refused to provide any information.  They have

25   stonewalled this case from the November 1st notice of

1      exclusion, right to this moment.  This conduct by the

2      Air Force, Your Honor, comes to this court, a court of

3      equity, with unclean hands.  Their conduct is the

4      perfect of example of unclean hands in the conduct of

5      a procurement.  Fair and reasonable, the implied

6      contract of fair dealing, it's been thrown out the

7      window, Your Honor, in the course of performance, over

8      the course of months and months of this procurement.

9      But this last stage, this end stage game that they're

10     playing, the hide-the-ball game, it's absolutely over

11     the top, Your Honor, and this Court should not

12     countenance this form of behavior.

13          THE COURT:  Mr. McCullough, given the

14     pleadings as filed, and as you point out, they were

15     filed on the assumption that the protest was a pre-

16     award protest, nonetheless, is it the Plaintiff's

17     position that the present record is adequate for the

18     Court to enter a temporary restraining order should it

19     feel that such is warranted?

20          MR. MCCULLOUGH:  Yes, Your Honor.  Attached

21     to our pleadings, we provided voluminous information

22     to the Court.  I should note that Hawker was never

23     debriefed in this case.  As Your Honor understands the

24     pre-award and post-award debriefing process, Hawker

25     was denied a debriefing.  And we have attached to our

1    pleadings both excerpts -- actually, very full some

2    excerpts from the solicitation and the statement of

3    performance requirement.  We have attached affidavits.

4    We believe that you have a record adequate, under the

5    circumstances, and with Mr. Bennett's representation

6    that they have now gone ahead and made an award, to

7    render a TRO on the papers as presented.

8         THE COURT:  Mr. Bennett, what's your

9    rejoinder to that statement by Mr. McCullough, if any?

10        MR. BENNETT:  Well, again, Your Honor, I

11   think we would just point to the stated harms in the

12   papers and my prior explanation as to why all of those

13   harms would be eliminated should this Court find that

14   Hawker was, in fact, wrongfully excluded and should

15   Hawker, in fact, win the contract.  To the extent that

16   Your Honor would request a responsive briefing from

17   us, we would ask that we be given one week from today

18   in which to file it.

19        THE COURT:  And that brief would address

20   what issues?

21        MR. BENNETT:  That brief would address all

22   four of the injunctive relief factors.

23        THE COURT:  So, it would be directed to the

24   request for injunctive relief?

25        MR. BENNETT:  Yeah, the request for the

1    preliminary injunctive relief, Your Honor.

2          THE COURT:  Okay.  Let's put that aside for

3    a moment, if we might, we'll come back to it, and take

4    a look at Section 4 of Appendix C, at paragraph eight,

5    which lists some items that we need to talk about and

6    resolve.

7          MR. BENNETT:  Okay.

8          THE COURT:  The first is paragraph 8(c), any

9    request for a temporary or preliminary injunctive

10   relief, see paragraph 15.  As I've indicated, I think

11   we should put that aside for the time being.

12          Subparagraph d refers to the content of a

13   protective order, if requested by one or more of the

14   parties.  That, it seems to me, has been requested by

15   counsel for Plaintiff in the proposed protective

16   order, which counsel for Plaintiff has attached to his

17   motion to file a protective order.  The Court is

18   inclined to enter the protective order substantially

19   in the form that counsel for Plaintiff has tendered

20   it, but, I'm open to discussion on that.

21          MR. BENNETT:  As Your Honor may or may not

22   know, we have over at the Department of Justice a

23   variation on the standard protective order, which

24   makes changes to a couple of paragraphs.  I sent a

25   copy of that --

        1            THE COURT:  Let me just interrupt --

        2            MR. BENNETT:  -- to Mr. McCullough on

        3    Thursday, I believe, and I'm not sure whether he's had

        4    a chance to look at it yet or whether he has any

        5    objection to entering that version, as opposed to the

        6    Court's standard form protective order.

        7            THE COURT:  Let me just interrupt you, if I

        8    might.  I don't think the issue is with respect to the

        9    Court's standard protective order.  I don't think

       10    anybody is advocating for that, at the moment.

       11            MR. BENNETT:  Okay.

       12            THE COURT:  My view of the proposed

       13    protective order, filed by counsel for Plaintiff, is

       14    that it substantially meets all of the objections

       15    previously asserted by the Justice Department in

       16    connection with these bid protests.  And I think, I'm

       17    not obviously able to get into the mind of the

       18    draftsperson, but it looks to me like counsel for

       19    Plaintiff has endeavored to tender a proposed

       20    protective order, which anticipates the points, I

       21    think, Mr. Bennett, that you're drawing our attention

       22    to.  But, I'll let Mr. McCullough respond.

       23            MR. MCCULLOUGH:  Yes, Your Honor.  Mr.

       24    Bennett did kindly send over the Department's standard

       25    revisions.  We reviewed them.  We had no objection.

1    We then attempted to incorporate them into the draft

2    protective order we sent to the Court with our

3    pleadings yesterday.  So, subject perhaps to his

4    reviewing our implementation, I think, with Mr.

5    Anstett here, we just took his proposed Department of

6    Justice revisions and incorporated them into the

7    proposed protective order.

8         MR. BENNETT:  Okay, thanks.  I confess, as

9    you can all probably tell, I did not review the

10   protective order that you guys filed.  I was busy

11   reviewing the other filings.

12        THE COURT:  Accepting Mr. McCullough's

13   representations as true and correct, would you have

14   any objection to the entry of the proposed protective

15   order?

16        MR. BENNETT:  None at all, Your Honor.

17        THE COURT:  Thank you.  Let's move on, then.

18   The content of and time for filing the administrative

19   record.  Mr. Bennett, I think you had given some

20   indication of an aggressive briefing schedule that

21   would get us to the point where we could, if we get

22   there, resolve the matter on the merits.  Do you want

23   to recapitulate that for us or perhaps you and Mr.

24   McCullough have conferred on this subject?

25        MR. BENNETT:  We have not specifically

1    discussed the schedule.  We discussed our differing

2    positions on the preliminary injunctive relief issue,

3    Your Honor, so -- and we did not get much beyond

4    there, in terms of discussing a schedule.  From my

5    conversations with the contracting officer, the agency

6    believes that -- unfortunately, they're working with a

7    bit of a skeleton crew this week and the

8    administrative record is fairly voluminous, but they

9    believe that they could get it to me by no later than

10   Thursday of next week.  And if I could have Friday and

11   Monday to review it, we would be able to file on the

12   following Tuesday, which is the 10th.

13          As I said, we would be happy to do one-week

14   turnaround times on the motions and the replies.  We'd

15   be happy to do two-week turnaround times on the

16   motions and then one-week turnaround times on the

17   replies.  Again, we're willing to work on whatever

18   sort of schedule Mr. McCullough and Mr. Anstett would

19   like to work on.

20          THE COURT:  And I take it from what you

21   said, that the government would be in a position to

22   produce the administrative record by Tuesday, the 10th

23   of January?

24          MR. BENNETT:  Yes, Your Honor.

25          THE COURT:  And from that point on, can we

1    talk about the schedule of further filings?  I take it

2    we would want to have cross motions for judgment on

3    the administrative record.  We can do simultaneous

4    filings, if that were satisfactory to the parties.

5    Then, we would need oppositions and after that,

6    replies.  As I'm indicating, I think all of those

7    could be done by simultaneous filings.  If we did

8    that, Mr. Bennett, the deadline for filing cross

9    motions for judgment on the administrative record,

10    under your scenario, would be what, two weeks after

11    January 10th?

12            MR. BENNETT:  Yeah.  Well, we could do

13    either January 17th or January 24th.  The 17th,

14    obviously, would be one week.  The 24th would be two.

15    Our only concern with respect to doing simultaneous

16    filings, Your Honor, is that, as Mr. McCullough

17    mentioned earlier, they did not yet receive briefing

18    in this case and based on my past experience in these

19    bid protests, there's a possibility that their claims

20    may change fairly substantially once they receive the

21    administrative record.  So, if we were to do

22    simultaneous filings, I worry that we would spend time

23    briefing -- or responding to claims that are no

24    longer, in fact, the actual claims.  So, we may be

25    like ships passing in the night, Your Honor.

1          So, I would be more inclined to do -- they

2    file their MJAR and then we respond to that. Then they

3    file a reply and then we file our reply.  I think that

4    may be more helpful to the Court, in this particular

5    case.

6          THE COURT:  Can you fill in the dates that

7    that schedule would imply?

8          MR. BENNETT:  Well, if we were to do one-

9    week turnaround time, Your Honor, that would be --

10   they would file their MJAR on January 17th.  We would

11   reply on January 24th; they would reply on January

12   31st; and we would file our final brief on February

13   7th.  If we were to do two-week turnaround times for

14   the initial brief, they would file their MJAR on

15   January 24th. We would file ours on February 7th. They

16   would reply on February 14th and we would file our

17   reply on February 21st.

18         THE COURT:  Mr. McCullough, do you have a

19   preference?

20         MR. MCCULLOUGH:  Well, I do, Your Honor.  As

21   Mr. Bennett mentioned and I argued, we have never

22   received a debriefing.  And so, both we, the lawyers,

23   counsel, and the client have never been provided with

24   the actual basis for their disqualification from the

25   competitive range.  With that said, they will be

1   seeing that for the first time when they receive the

2   administrative record.  Now, I should note, at this

3   point, we believe that Hawker Beechcraft should -- is

4   entitled to see the part of the administrative record

5   that deals with Hawker Beechcraft's evaluation and why

6   they were disqualified from the competitive range.

7           We believe, Your Honor, we're going to need

8   a minimum of two weeks to review that record, to then

9   coordinate with our client about what the underlying

10  technical issues are.  And I might note, Your Honor,

11  unfortunately, this is one of those cases where it's

12  not necessarily at this point clear exactly what the

13  technical issues in the case are.  And the technical

14  issues that were in play during the discussions

15  process in the last stages were multiple technical

16  issues relating to aircraft airframe capabilities,

17  capacities, performance requirements and the like.

18  And so, this is not a simple case.

19          THE COURT:  Is that a way of saying that as

20  far as the Plaintiff is concerned, it would prefer

21  that its brief, rather than being filed on the 17th,

22  would be filed on the 24th?  Or have I got those dates

23  wrong?

24          MR. MCCULLOUGH:  Those were Mr. Hunter's

25  dates,  Your Honor.  We would prefer that actually our

1    brief, our opening brief, given what has transpired

2    here, be actually the third week out, on the 31st of

3    January.

4             THE COURT:  Okay.  And then that's the

5    Plaintiff's opening brief.  Then, we have a deadline

6    for the government's response in opposition, which

7    would be what?

8             MR. BENNETT:  We would prefer two weeks in

9    that case, Your Honor, which would take us --

10            THE COURT:  And that would take us to --

11            MR. BENNETT:  -- to, I think, February 14th.

12            THE COURT:  Right.  Okay.  And then

13   Plaintiff would reply?

14            MR. MCCULLOUGH:  We could reply in a week,

15   Your Honor.

16            THE COURT:  That would take us to the 21st

17   of January?

18            MR. BENNETT:  Yes.

19            THE COURT:  And then --

20            MR. BENNETT:  And then, we could reply by

21   the 28th, Your Honor.

22            THE COURT:  Okay.  That looks like a

23   sensible schedule.  Any further comments on the

24   briefing schedule?

25            MR. MCCULLOUGH:  Your Honor, I would just

1    note, in concurrence with Mr. Bennett, that one of the

2    things that does happen in this kind of a case is when

3    we see the record, there will be very likely a need

4    for an amended complaint.  And so, first, let me say,

5    we would endeavor to amend the complaint as quickly as

6    possible after receipt of the administrative record.

7    That might throw the schedule for both our opening

8    brief and the government's opening brief a little bit

9    further down the time line because it's very possible

10   that the problems that we thought we had are not the

11   real problems.  There are other problems and then

12   we'll have to deal with those other problems through

13   an amended complaint.

14        MR. BENNETT:  Your Honor, I don't -- you

15   know, I've had this happen in prior cases, as I

16   mentioned, and I don't recall in those cases an

17   amended complaint actually being filed.  I don't

18   really feel strongly -- I mean, if they're going to

19   lay out all their claims in their motion, I don't

20   really feel strongly that they would need to amend

21   their complaint, just have that on the record.  I find

22   in these cases, a lot of times, the complaint ends up

23   being sort of an afterthought.

24        THE COURT:  Mr. McCullough, does that ease

25   your concern?

1        MR. MCCULLOUGH:  It absolutely does.  We

2    would just be concerned with timeliness, Your Honor,

3    and with that concession, we don't have that problem.

4        THE COURT:  Great, thank you.  I'm looking

5    through Appendix C to see what other items we're

6    directed to discuss, and I think we have covered all

7    the bases, with the exception of the request for a

8    temporary restraining order and preliminary

9    injunction.  Do counsel agree, have we covered

10   everything except that now?

11       MR. BENNETT:  Oh, one other issue, Your

12   Honor --

13       THE COURT:  Yes.

14       MR. BENNETT:  -- is just with respect to the

15   filing of the administrative record.

16       THE COURT:  Yes.

17       MR. BENNETT:  My understanding is it's

18   voluminous.  So, if Your Honor has no objection, if we

19   could file it on compact disks, and then we would

20   provide you with a courtesy copy that was paper.

21   Would that be all right with Your Honor?

22       THE COURT:  That's fine, except we would

23   like two paper copies.

24       MR. BENNETT:  Okay.

25       MR. MCCULLOUGH:  And, Mr. Bennett, just as a

1    clarification, as I've noted earlier, we would want to

2    be able to provide access to the part of the

3    administrative record that deals with Hawker and its

4    evaluation to Hawker.  So, that might entail two

5    separate disks:  one that can be released to Hawker

6    and one that should not be released to Hawker.

7              MR. BENNETT:  Okay.  Well, you and I can

8    discuss the mechanics of that.  I guess -- I mean, I

9    confess, I'm not all that familiar with what typically

10   goes to clients in these cases and what does not.

11   But, if it's that they can only see the portions of

12   the administrative record that deals specifically with

13   Hawker, yeah, I would have no objection to providing a

14   disk that only pertains to Hawker, provided that, of

15   course, we would err on the side of caution and do our

16   best to -- you know, if there was something that

17   pertained to both Hawker and other parties, I guess we

18   would figure out how to deal with it, at that point.

19             MR. MCCULLOUGH:  Understood.  I should also

20   just note for the record that, essentially, now with

21   there having been an award made, Embraer is now in

22   play.

23             THE COURT:  That's right.

24             MR. MCCULLOUGH:  I don't know how the agency

25   came to its conclusion.  But, if there's any kind of

1    comparative analysis between Hawker's proposal and

2    Embraer's proposal, we will then implicate the

3    evaluation of Embraer's proposal, which would mean

4    that the evaluation of Embraer's proposal should be in

5    the administrative record, so the Court can review how

6    the agency came to the conclusion that Embraer met

7    requirements that Hawker didn't meet.

8         You will note from our pleadings that there

9    is a count that deals with what I will call the

10   agency's deviation from the non-developmental item,

11   nature of the procurement that was announced.  And in

12   making those arguments, we have brought into play the

13   fact that there is no current airplane, either from

14   Hawker or from Embraer or anybody else, that meets the

15   requirements that were imposed on Hawker through the

16   discussions process.  What that means is that if the

17   agency believes that Embraer's aircraft does meet

18   these requirements without minor modification, that

19   that is definitely in play in the complaint, as

20   currently put on the table.

21        And so, that's why I caution in terms of,

22   you have before you a complaint that's, in effect,

23   saying, no aircraft meets the solicitation

24   requirements at the moment without significant

25   revisions.  That means that the agency has deviated

1    from the non-developmental item, NDI, nature of the

2    announced procurement and that means that the agency

3    is going to have to defend their conduct on the basis

4    of showing that an aircraft currently under evaluation

5    does meet their requirements with only minor

6    modifications.  That would mean that in the

7    administrative record, you would include information

8    about the evaluation of Embraer's proposal.

9            THE COURT:  For what it's worth, I would

10   think that that should be the case.

11           MR. BENNETT:  Yes, as would I.

12           THE COURT:  Yes.  I think --

13           MR. BENNETT:  Again, I haven't seen the

14   administrative record yet, but, I mean, I believe that

15   that would all be in there.

16           MR. MCCULLOUGH:  Good.  And that just goes

17   to my point about needing to segregate that, because

18   Hawker can't see that.

19           MR. MCCULLOUGH:  Okay.

20           THE COURT:  Now, circling back to where we

21   left off, I must say, the Court is very concerned

22   about the commencement of performance and the effect

23   on the protest of continuing performance by the

24   putative awardee, Embraer.  Mr. Bennett, I'm going to

25   give you one more chance to tell me why there

1      shouldn't be a temporary restraining order lest the

2      continued performance by Embraer prejudices the

3      Plaintiff to the point where it becomes, as we say, a

4      fait accompli.  Mr. Bennett?

5           MR. BENNETT:  Well, Your Honor, as I

6      mentioned earlier, they identified three harms in

7      their papers:  the loss of the opportunity to compete.

8      The possibility of being excluded from future LAS

9      orders and the denial of the right to have a bid

10     fairly and lawfully considered.  Again, none of these

11     harms is going to be exacerbated by declining to grant

12     preliminary injunctive relief at this point.  In fact,

13     should --

14          THE COURT:  I don't -- Mr. Bennett, let me

15     interrupt you right there.  How can that be if Embraer

16     is throughout all of this period continuing to

17     perform?

18          MR. BENNETT:  Well --

19          THE COURT:  How can you say that there's no

20     injury to the Plaintiff in that circumstance?

21          MR. BENNETT:  Well, because, Your Honor,

22     this is a contract for the purchase of airplanes.  If

23     Your Honor were to find that Hawker were wrongfully

24     excluded from consideration in this case and if Hawker

25     were ultimately to win the award, then the Air Force

1    would not -- would no longer buy their planes from

2    Embraer.  They would buy them from Hawker Beechcraft.

3            THE COURT:  So --

4            MR. BENNETT:  They would still buy the two

5    planes that are scheduled for delivery currently in

6    April of 2013. They would just buy those from Hawker

7    now, as opposed from Embraer.  And, again, although

8    Embraer may incur some expenses that it can be

9    reimbursed by the Air Force for, again, that's not a

10   Hawker problem. That's not taking away from any sort

11   of award that Hawker is going to receive down the

12   line.  All that means -- I mean, that's really an Air

13   Force problem, rather than a Hawker problem.

14            There is no sort of financial harm that

15   they're going to suffer if Embraer continues to

16   perform while this bid protest is pending.

17            THE COURT:  Is that necessarily the case,

18   though?  Why wouldn't the case argue that the

19   continued performance has so, what shall we say,

20   permitted Embraer to undertake substantial amounts of

21   work, to be up the learning curve, such that if, as

22   you say, later it was determined that the award should

23   have been to the Plaintiff, that the government would

24   argue, well, you know, they might have been entitled

25   to equitable relief when the filed the complaint but,

1    now, after this lengthy period of performance by

2    Embraer, the balance of harms shifts in favor of the

3    government because the government has invested all of

4    this time, energy, and money in the entity that

5    ultimately is determined not to be the appropriate

6    awardee.

7            MR. BENNETT:  Well, Your Honor, that's --

8    were we to do that down the road, that would be -- I

9    imagine Your Honor would probably see it as us trying

10   to have it both ways, arguing it on the front end that

11   there's no harm and continuing to go forward and then

12   arguing on the back end that, hey, they went forward

13   and now we've gone too far and we can't come back.

14           THE COURT:  What about that?

15           MR. BENNETT:  Well, as I sit here now, Your

16   Honor, I don't envision myself doing that.

17           THE COURT:  Well, then, why -- then why

18   wouldn't the Air Force agree to suspend performance by

19   Embraer, pending the resolution of the case, pursuant

20   to the briefing schedule, which, as you say, is

21   expedited, that we've discussed?

22           MR. BENNETT:  Well --

23           THE COURT:  Why do they insist on going

24   forward in the face of the protest when it's quite

25   possible that down the road, they're going to have to

1    unwind or put the toothpaste back in the tube of

2    Embraer and go with the Plaintiff in this case?  Why

3    would they do that?

4            MR. BENNETT:  Well, first of all, Your

5    Honor, the Air Force believes strongly that it acted

6    entirely properly throughout the course of this

7    procurement.

8            THE COURT:  And I'm sure it will tell us

9    that when it argues the merits.  I'm talking about

10   interlocutory relief at this point.

11           MR. BENNETT:  Well, again, Your Honor,

12   granting preliminary injunctive relief is an

13   extraordinary remedy.  And, at this point, the Air

14   Force believes strongly -- these first two planes are

15   scheduled to be delivered in April of 2013.  The Air

16   Force believes that it's imperative that it meet the

17   schedule and it believes that, in order to meet the

18   schedule, it needs to have Embraer performing on the

19   contract while this -- while this bid protest is being

20   litigated.

21           THE COURT:  But why wouldn't the government,

22   then, be expected to argue precisely that we need to

23   keep Embraer on the job -- notwithstanding the

24   validity of the Plaintiff's assertions, we need to

25   keep Embraer on the job because we've got this April

1    13th deadline?

2         MR. BENNETT:  Well, because, again, I think,

3    Your Honor, at that point if it were pointed out to

4    the Air Force that they had, in fact, done something

5    wrong, I think the Air Force would then say, you know

6    what, we've made a mistake, we need to go back, and we

7    need to do this the right way.

8         THE COURT:  Or they could say, we know we

9    should go back and do it the right way, but the

10   overriding consideration in terms of the public

11   interest and the national security interest is in

12   getting these planes and that's got to take precedence

13   over some, perhaps, failing in the procurement

14   process.

15        MR. BENNETT:  Well, they could make that

16   argument.  As I said to Your Honor earlier, I don't

17   envision myself making that argument should Your Honor

18   rule against us.  And, again, I, also, don't imagine

19   that Your Honor would have a whole lot of time for

20   that argument, particularly given our discussion at

21   this point.

22        THE COURT:  Anything further, Mr.

23   McCullough?  I guess --

24        MR. MCCULLOUGH:  Your Honor, yes.  I would

25   just point out that as I have seen and Your Honor may

1    have seen over the course of extended litigation, that

2    the Justice Department frequently will flipflop in its

3    position because its client, the agency, requires it

4    to do that.  And I don't believe that Mr. Hunter's

5    good faith representations at this point in the

6    proceedings bind anybody.  They don't bind the Justice

7    Department and they don't bind the Air Force.  For

8    sure, they do not bind the Air Force.  And I would

9    just say that the articulation of irreparable harm

10   that we have made in the pleadings and today in this

11   argument meet the Court's standards for issuance of a

12   TRO.

13          THE COURT:  Mr. Bennett, we have set up a

14   briefing schedule with respect to the merits.  I'm

15   sympathetic to the notion that with respect to the

16   application for TRO, the government has actually not

17   been heard in opposition to that.  So, I'm not sure

18   exactly what effect it would have, but query whether

19   we shouldn't have a sort of mini parallel briefing

20   scheduling dealing with the Plaintiff's request for

21   interlocutory relief.

22          MR. BENNETT:  Your Honor, we would very much

23   like to file a brief on this.

24          THE COURT:  Now, you had said --

25          MR. BENNETT:  If we could --

1          THE COURT:  You had given us a date by which

2     you thought you could do that.

3          MR. BENNETT:  I believe we could file

4     something by a week from today, Your Honor.

5          THE COURT:  And that would be for my

6     benefit, a week --

7          MR. BENNETT:  That would be January 4th.

8          THE COURT:  January 4.  And Mr. McCullough,

9     do you wish to have a little opportunity to reply to

10    that or not?

11         MR. MCCULLOUGH:  Yes, we would, Your Honor.

12    We would file a reply brief -- I need to just check

13    the calendar -- by Monday, the 9th.

14         THE COURT:  Okay.  Let's do that and let's

15    also set a further status conference after that

16    briefing has taken place.  In the meantime, the Court

17    is inclined to defer consideration of the motions for

18    interlocutory relief pending an opportunity for the

19    government to file an opposition and the Plaintiff to

20    file a reply.  I think at that stage, the Court would

21    be more comfortable granting a TRO, if that's the way

22    the briefs point.

23         And I must say, Mr. Bennett, without in any

24    way prejudging the matter, it does disturb the Court a

25    little bit to see the Air Force charging ahead here in

1    the face of -- in the face of the protest and well

2    knowing that if down the road the Plaintiff's position

3    is determined to have merit, the government is then

4    going to be required to unwind the Embraer activity

5    and it's going to lose the benefit of all of the

6    performance by Embraer up to that time.  So, it's

7    frankly hard for the Court to see why that's in the

8    best interest of the government.  But, the Court will

9    let counsel for the government explain that in his

10   further filing.

11            MR. BENNETT:  Thank you, Your Honor.

12            THE COURT:  But coming back to the further

13   status conference, Monday the 9th -- what if we had a

14   further status conference on Wednesday, the 11th?

15   Counsel, what do you think of that?

16            MR. MCCULLOUGH:  We can participate, Your

17   Honor.

18            THE COURT:  Mr. Bennett?

19            MR. BENNETT:  As can I, Your Honor.

20            THE COURT:  Well, then, why don't we set it

21   for 10:00 a.m. on -- now I can't read my own writing -

22   - the 11th, yes, the 11th of January 2012.  Okay.

23   Anything further, gentlemen?

24            MR. BENNETT:  Not from the government, Your

25   Honor.

1           THE COURT:  Mr. McCullough?

2           MR. MCCULLOUGH:  Nothing from Plaintiff,

3      Your Honor.

4           THE COURT:  Thank you all, very much.  We'll

5      put out an order embodying the deadlines and schedules

6      that we've set and the Court appreciates your

7      responding to this matter as expeditiously as you

8      have.  Thank you all, very much.  Good bye.

9           (Whereupon, at 11:39 a.m., the hearing in

10      the above-entitled matter was concluded.)

11      //

12      //

13      //

14      //

15      //

16      //

17      //

18      //

19      //

20      //

21      //

22      //

23      //

24      //

25      //

## CERTIFICATE

DOCKET NO.:  11-897C

CASE TITLE:  Hawker Beechcraft Defense Co. LLC v. U.S.

HEARING DATE:  December 28, 2011


        I certify that the foregoing is a true and

correct transcript made to the best of our ability

from a copy of the official electronic digital

recording provided by the United States Court of

Federal Claims in the above-entitled matter.



                        Date:  December 28, 2011

        _____

                        Theresa A. Rowell
                Heritage Reporting Corporation
                        Suite 600
                    1220 L Street, N.W.
                Washington, D.C.  20005-4018